## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RANN PHARMACY, INC.** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SHREE NAVDURGA LLC d/b/a** | : | |
| **RAMS PHARMACY, et al.,** | : | **No. 16-4908** |
| **Defendants.** | : | |

### MEMORANDUM

**Schiller, J.**                                                    **November 22, 2016**

Rann Pharmacy seeks to enjoin Lakshmi Ramesh Kommineni and Shree Navdurga LLC, d/b/a Rams Pharmacy (together, "Rams Pharmacy"[1]) from service mark infringement, defamation, and tortious interference with prospective contracts. Rann Pharmacy alleges that the name RAMS PHARMACY infringes on its rights under the Lanham Act by confusing medical consumers. Rann Pharmacy also claims that Rams Pharmacy defamed Rann's reputation and interfered with Rann's prospective contracts by accusing Rann of violating the Health Insurance Portability and Accountability Act. Rann Pharmacy has moved for a temporary restraining order and preliminary injunction.

The Court held two hearings on the motion, the latter of which it consolidated with the trial on the merits under Federal Rule of Civil Procedure 65(a)(2). Pursuant to Federal Rule of Civil Procedure 52(a), the Court now issues the following findings of fact and conclusions of

---

[1] Kommineni proceeds *pro se*; Shree Navdurga LLC d/b/a Rams Pharmacy is unrepresented. Because Kommineni is one of the owners of Rams Pharmacy, the Court refers to Defendants jointly as "Rams Pharmacy" unless necessary to state otherwise. Because Kommineni proceeds *pro se*, the Court has liberally construed his pleadings and will apply the relevant law regardless of whether he has mentioned it by name. *See Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003).

law. The Court finds that under Section 43(a) of the Lanham Act, the name RAMS

PHARMACY[2] is likely to cause confusion with the name RANN PHARMACY. The Court also

finds that Rams Pharmacy neither defamed Rann Pharmacy nor tortuously interfered with its

prospective contractual relations. The Court enjoins Rams Pharmacy from using the name

RAMS PHARMACY and dismisses Rann Pharmacy's remaining claims.


I.      **FINDINGS OF FACT**

        **A.  Rann Pharmacy and Rams Pharmacy**

        Rann Pharmacy is an independent pharmacy located at 377 Main Street in Harleysville,

Pennsylvania. (Am. Compl. ¶ 1.) The pharmacy has used the name RANN PHARMACY since

1982, and Greg Segner, the current owner, has used that name continuously since 1990. (Hr'g Tr.

12, Sept. 21, 2016 [hereinafter First Hr'g Tr.]; Pl.'s Revised Mem. Law 1.) On June 20, 2016,

Rann Pharmacy filed a service mark application for the standard character mark RANN

PHARMACY with the U.S. Patent & Trademark Office. U.S. Patent & Trademark Off., U.S.

Application Serial No. 87077542; (*see* Pl.'s Revised Mem. Law 1.) The application is currently

under examination. U.S. Application Serial No. 87077542, *supra.*

        In March 2016, Kommineni opened Rams Pharmacy at 801 West Main Street in

Lansdale, Pennsylvania, approximately six miles away from Rann Pharmacy. (Am. Compl. ¶ 10;

Defs.' Post-Hr'g Br. 1.) Prior to establishing his own pharmacy, Kommineni worked at Skippack

Pharmacy in Skippack, Pennsylvania. (*See* First Hr'g Tr. 7–8.) Kommineni, known as Ram,

---

[2] Kommineni told the Court that he is in the process of changing the name of his pharmacy to
RAMSRX PHARMACY, and submitted evidence showing that he has registered that name with
the Pennsylvania Department of State. (Hr'g Ex. D-1, Sept. 21, 2016; Defs.' Post-Hr'g Br. 20;
Hr'g Tr. 10, 46, Sept. 21, 2016; Hr'g Tr. 11–13, Nov. 2, 2016.) Because only the name RAMS
PHARMACY is before the Court, the Court will not decide whether RAMSRX PHARMACY
infringes on Rann Pharmacy's service mark.

named his pharmacy RAMS PHARMACY so that his customers would be able to follow him to his new location. (*Id.*)

On June 21, 2016, Rann Pharmacy sent Rams Pharmacy a cease-and-desist letter, alleging that the pharmacies' similar names were causing confusion. (Am. Compl. ¶ 16.) On July 29, 2016, Rann Pharmacy provided Rams Pharmacy's then-counsel with evidence of actual confusion, including misdirected prescriptions and an email from a pharmaceutical supplier.[3] (*Id.* ¶¶ 17–18; First Hr'g Tr. 14–20, 24–25.)

**B.  Evidence of Actual Confusion Between Rams and Rann Pharmacies**

Since Rams Pharmacy opened, medical professionals and a wholesale pharmaceutical supplier have confused the two pharmacies.

First, several medical providers have electronically submitted prescriptions to Rann Pharmacy that were intended for Rams Pharmacy. (First Hr'g Ex. P-1; Hr'g Tr. 11, Nov. 2, 2016 [hereinafter Second Hr'g Tr.].) Between May and October 2016, Rann Pharmacy received at least nine misdirected prescriptions from at least three different medical providers. (First Hr'g Ex. P-1; First Hr'g Tr. 12–18; Second Hr'g Tr. 11.) Segner learned of the mistakes when the prescribing physicians called him and wanted to know why their patients—who had presumably gone to Rams Pharmacy—could not pick up their prescriptions. (First Hr'g Tr. 15–19.) The misdirected prescriptions were caused in part by a delay in updating the relevant software at physicians' offices to include Rams Pharmacy, and in part because the medical providers were

---

[3] Rann Pharmacy repeatedly insists that Rams Pharmacy's then-counsel violated Federal Rule of Evidence 408 by sharing this evidence with his client, and/or that Rams Pharmacy violated Rule 408 by sharing this evidence with third parties. But Rule 408 only applies to documents obtained through settlement negotiations, and only bars a party from using those documents to prove liability, or to impeach a witness, in court. Fed. R. Evid. 408(a). Rule 408 does not prevent opposing counsel from sharing those documents with his client, or a party from sharing those documents with third parties. *Id.*

only aware of Rann Pharmacy and assumed patients asking for Rams meant Rann. (*Id.* 23, 41–42, 46; First Hr'g Ex. P-1; Defs.' Post-Hr'g Br. 6.) Prior to the opening of Rams Pharmacy, Rann Pharmacy received erroneous prescriptions only "[o]nce in a great while." (First Hr'g Tr. 19.)

Second, one of Rann Pharmacy's pharmaceutical suppliers thought that Rams Pharmacy was associated with Rann Pharmacy. (First Hr'g Ex. P-4.) The supplier, Value Drug Company, emailed Segner about "confusion in the distribution network at Value Drug regarding your Pharmacy Account 212, Rann Pharmacy." (*Id.*) Value Drug stated that "[y]our other pharmacy Ram Pharmacy in Lansdale is causing issues with our delivery driver," and cautioned that Segner was "required to let us know of any new location that you have moved your Pharmacy to or opened a new pharmacy." (*Id.*)

### C.  The Alleged HIPAA Violation

On July 29, 2016, Rann Pharmacy sent Rams Pharmacy copies of the misdirected prescriptions as evidence of actual confusion. (First Hr'g Ex. P-1.) Although Rann claims that it redacted all patient information, at least one of the documents sent to Rams included personally identifiable health information: the name, date of birth, and prescribed medications of Swamisaran Patel. (First Hr'g Ex. P-1; Answer Ex. 8.) Rams Pharmacy subsequently sent letters to Patel and two others, notifying them of a "potential breach of your personal health information." (Defs.' Post-Hr'g Br. Ex. 12–17; *see* First Hr'g Ex. P-1.) In the letters, Rams Pharmacy explained that it believed a third party had "inadvertently disclosed"[4] personally identifying health information to another third party on or around July 29, 2016. (Defs.' Post-Hr'g Br. Ex. 12–17.) Rams stated that the Health Insurance Portability and Accountability Act

---

[4] Two letters use the words "inadvertently disclosed"; one says only "disclosed." (*Compare* Defs.' Post-Hr'g Br. Ex. 13, *and* Ex. 15, *with* Ex. 17.)

("HIPAA") requires the pharmacy "to notify the affected individual wherever we think there is a possible breach of information." (*Id.*) The letters did not mention Rann Pharmacy or any violation of HIPAA. (*Id.*)

Kommineni then called Patel to the pharmacy to discuss the potential HIPAA breach. (First Hr'g Tr. 42–43.) As a result of this conversation, Patel and another individual each faxed letters to Rann Pharmacy. (First Hr'g Ex. P-5.) In his letter, Patel stated that he recently "came to know that one of the communication letter of my doctors office has been used by the pharmacy which has my information both personal and prescription details." (*Id.*) Patel wrote that he "can understand if it is between the healthcare providers or my existing pharmacy using the information regarding the treatment or filling of my prescriptions, but it has been used for different purpose by you who is not one of my providers, and Rann Pharmacy intentionally violated my HIPAA rights as the communication papers have my info like name, date of birth and the medication i take." (*Id.*) In the second letter, the author stated that he recently "came to know that you were using my prescription information without my consent." (*Id.*) Because the author "never gave any consent to use my information, . . . there may be a possible violation of HIPAA, because i am not sure about the extent of information you are sharing about me." (*Id.*) Both letters were faxed from Rams Pharmacy, though they were not prepared by Kommineni. (First Hr'g Tr. 43.)

## II.   CONCLUSIONS OF LAW

Rann Pharmacy moves to enjoin Rams Pharmacy on three counts. First, Rann alleges that the name RAMS PHARMACY is likely to cause (and has actually caused) confusion among consumers, constituting service mark infringement under Section 43(a) of the Lanham Act.

Second and third, Rann alleges that Rams Pharmacy accused Rann of violating HIPAA, which constitutes defamation and tortious interference with prospective contracts.

The Court will grant an injunction against the service mark RAMS PHARMACY because it is likely to cause confusion. The Court will deny an injunction for the other two claims on the merits.

### A.  Service Mark Infringement Under the Lanham Act

The Trademark Act of 1946, as amended, Pub. L. No. 79-489, 60 Stat. 427—otherwise known as the Lanham Act—serves to protect "consumers from deception and confusion over trade symbols and to protect the plaintiff's infringed trademark as property." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2:2 (4th ed. 2016) (emphasis omitted) [hereinafter *McCarthy on Trademarks*]; *see Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992).

The Lanham Act defines a "service mark" as "any word, name, symbol, or device, or any combination thereof" that is "used by a person" to "identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), protects qualifying service marks, such as RANN PHARMACY, that have not been registered with the U.S. Patent and Trademark Office. *See Two Pesos*, 505 U.S. at 768. The law imposes liability on any person who, in connection with services, uses a mark that is likely to cause confusion with respect to another unregistered mark. § 1125(a)(1)(A). Rann Pharmacy specifically alleges that the use of RAMS PHARMACY is likely to cause confusion about the origin of Rann's services, (Am. Compl. ¶ 28; Pl.'s Post-Hr'g Br. 11–12), which is known as "false designation of origin." *Dille*

*Family Trust v. Nowlan Family Trust*, Civ. A. No. 15-6231, 2016 WL 4943361, at *6 (E.D. Pa. Sept. 16, 2016).

To make out a false designation of origin claim, Rann Pharmacy must prove that it (1) owns a (2) valid and legally protectable mark, and (3) that use of the mark RAMS PHARMACY is likely to create confusion concerning the origin of the services. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990); *see also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

### i.     Rann Pharmacy Owns a Valid and Legally Protectable Mark

Because Rann Pharmacy does not have a registered service mark, it must satisfy the ownership, validity, and legally protectable requirements by demonstrating that (A) it "was the first to adopt the mark in commerce;" (B) it "has used the mark continuously in commerce since its adoption;" and (C) its "mark is inherently distinctive or has acquired secondary meaning." *Delaware Valley Fin. Grp., Inc. v. Principal Life Ins. Co.*, 640 F. Supp. 2d 603, 619 (E.D. Pa. 2009) (citing *Douglas v. Osteen*, 317 F. App'x. 97, 99 (3d Cir. 2009); *A & H Sportswear*, 237 F.3d at 210–11); *see Ford Motor Co. v. Summit Motor Prod., Inc*., 930 F.2d 277, 291–92 (3d Cir. 1991) (holding that for unregistered marks, "validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive," and "the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce").

Courts use four categories to classify the distinctive strength of a mark, from strongest to weakest: "(1) arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; (2) suggestive terms, which suggest rather than describe the characteristics of the goods; (3) descriptive terms, which describe a characteristic or ingredient of the article to which it refers; and (4) generic terms, which function as the common descriptive

name of a product class." *E.T. Browne Drug Co. v. Cococare Prod., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008) (alteration omitted) (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986)). Within the first category, fanciful terms are "'coined' words that have been invented or selected for the sole purpose of functioning as a trademark" or service mark. 2 *McCarthy on Trademarks* § 11:5. They contain "words that are either totally unknown in the language or are completely out of common usage at the time, as with obsolete or scientific terms." *Id.* Fanciful terms are among those marks that receive the strongest protection under the Lanham Act "because their intrinsic nature serves to identify a particular source" of the services. *Two Pesos*, 505 U.S. at 768. In other words, fanciful terms are "inherently distinctive." *Id.*

Although each mark "must be viewed in its entirety, . . . one feature of a mark may be more significant than other features, and it is proper to give greater force and effect to that dominant feature." *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991) (internal quotation marks omitted). For the purposes of determining whether a mark violates the Lanham Act, however, "the entire composite mark, including the [generic] terms, is considered." *Id.*; *A & H Sportswear*, 237 F.3d at 218. The Third Circuit has declined to issue a "per se rule about the impact of generic terms within a nongeneric trademark," leaving the "weight to be given each word . . . to the fact-finder." *A & H Sportswear*, 237 F.3d at 218. Here, both marks contain the word "pharmacy," which is a generic term for pharmaceutical services that does not receive protection under the Lanham Act. Although the Court does not ignore the word PHARMACY in each mark, the Court will treat the terms RANN and RAMS as the dominate features.

The first two elements of a false designation of origin claim are easily satisfied here, even though Rann does not have a registered mark. First, Rann Pharmacy was the first party to adopt

8

its mark. Second, the owner of Rann Pharmacy has used the mark RANN PHARMACY continuously since 1990, well before Rams Pharmacy opened in March 2016. Finally, the word "rann" is an Irish English word that means "a piece of Irish verse; a stanza, a quatrain," but lacks modern usage. *Rann*, Oxford English Dictionary (3rd ed. 2008). Because "rann" is out of common usage, 2 *McCarthy on Trademarks* § 11:5, the mark RANN PHARMACY is fanciful and therefore inherently distinctive. *See Two Pesos*, 505 U.S. at 768.

As a result, Rann Pharmacy owns a valid and legally protectable mark, making out the first two elements of a false designation of origin claim.

### ii. The Mark RAMS PHARMACY is Likely to Cause Confusion with the Mark RANN PHARMACY

In addition to owning a valid and legally protected mark, "a plaintiff must also prove likelihood of confusion, which is said to exist 'when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Ford Motor Co.*, 930 F.2d at 292 (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978)). In a "direct confusion" claim such as this one, the "senior user" of a mark (Rann Pharmacy) alleges that a "junior user" (Rams Pharmacy) is attempting to "free-ride on the reputation and goodwill of the senior user by adopting a similar or identical mark." *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005).

To determine whether a defendant's mark is likely to cause direct confusion, the Third Circuit evaluates ten factors, known as the *Lapp* factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of similarity of functions; and

(10) other factors suggesting the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

*Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 182 (3d Cir. 2010) (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)).

No single factor is determinative, and "each factor must be weighed and balanced one against the other." *Id.* at 182–83 (internal quotation marks omitted). Indeed, "the *Lapp* test is a qualitative inquiry, and '[n]ot all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting.'" *Basketball Mktg. Co. v. FX Digital Media, Inc.*, 257 F. App'x 492, 494 (3d Cir. 2007) (alteration in original) (quoting *A & H Sportswear*, 237 F.3d at 215). "A district court should utilize the factors that seem appropriate to a given situation but, in so doing, it is incumbent upon the district courts to explain the choice of *Lapp* factors relied upon." *Delaware Valley Fin. Grp.*, 640 F. Supp. 2d at 620.

That being said, the "single most important factor in determining likelihood of confusion is mark similarity." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 712–13 (3d Cir. 2004) (internal quotation marks omitted). "Courts should compare the appearance, sound and meaning of the marks in assessing their similarity." *Id.* at 713 (internal quotation marks omitted). "Where the goods are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." *Id.* (internal quotation marks omitted).

In addition, "[t]he likelihood of confusion with which the Lanham Act is concerned is not limited to confusion of [services] among *purchasers*." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 321 (3d Cir. 2015) (emphasis added). Section 43(a) prohibits the use of marks that are "likely to cause confusion, or to cause mistake, or to deceive," but does not limit the confusion, mistake, or deception to any particular group of people. § 1125(a)(1)(A). Instead, the Lanham Act is "broad enough to cover the use of [service marks] which are likely to cause confusion, mistake, or deception *of any kind*, not merely of purchasers." *Kos Pharm.*, 369 F.3d at 711 (internal quotation marks omitted).

The Third Circuit has recognized certain groups of non-purchasers as relevant to the likelihood of confusion analysis, including: suppliers, *Country Floors*, 930 F.2d at 1064; professionals working in the same industry as the parties, *id.*; and "persons in a position to influence a purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner." *Arrowpoint Capital*, 793 F.3d at 323 (internal quotation marks and alterations omitted). In a trademark infringement case involving two prescription drugs, the Third Circuit analyzed the confusion of doctors, nurses, and pharmacists even though they did not purchase the drugs. *Kos Pharm.*, 369 F.3d at 715–16. The court noted that these medical professionals "play a gate-keeping role between patients and prescription drugs" but "are not the ultimate consumers"—"[p]atients are." *Id.* at 715 n.12. Nevertheless, the court reversed the district court's denial of preliminary injunction, finding that the confusion of doctors and pharmacists (among other factors) indicated that the plaintiff was likely to succeed on the merits. *Id.* at 725.

Contrary to the claims of both parties, the relevant class of consumers in this case includes both medical professionals (i.e., suppliers and physicians issuing prescriptions) and

patients (i.e., purchasers of goods and services from the pharmacies). *See Arrowpoint Capital*, 793 F.3d at 323; *Kos Pharm.*, 369 F.3d at 715 & n.12; *Country Floors*, 930 F.2d at 1064.

### a.   Degree of Similarity (*Lapp* Factor 1)

Similar marks are highly likely to cause confusion, especially when the services are directly competing. The "single most important factor in determining likelihood of confusion is mark similarity," measured by the sound, appearance, and meaning of the two marks. *Kos Pharm.*, 369 F.3d at 712–13 (internal quotation marks omitted).

RANN and RAMS look similar: both are four letters and both begin with the same two letters. RANN and RAMS also sound similar, and the pharmacies are direct competitors. Although RANN and RAMS have different meanings (the former, a piece of Irish verse; the latter, the possessive form of the defendant co-owner's nickname), the two marks are similar enough for this factor to weigh strongly in favor of Rann Pharmacy.

### b.   Strength of Rann Pharmacy's Mark (*Lapp* Factor 2)

If the plaintiff's senior mark is strong, then the adoption of a substantially identical junior mark is likely to cause consumers to mistakenly associate the junior mark with the senior. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 282 (3d Cir. 2001). The "strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition." *Id.* Distinctiveness is primarily measured by the inherent features of the mark, with fanciful and arbitrary marks receiving stronger protection than other marks. *Id.* Commercial strength is measured by looking "at the strength of the mark in the industry in which infringement is alleged." *Id.* at 284.

As noted earlier, the name RANN PHARMACY qualifies as a fanciful mark—the most distinctive category of service marks. *See Two Pesos*, 505 U.S. at 768. In addition, Rann

12

Pharmacy has operated for over 26 years as a local, independent pharmacy. The Court can reasonably conclude that Rann Pharmacy enjoys strong commercial recognition among pharmacy consumers in the Harleysville-Lansdale area. *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 104 F. Supp. 2d 427, 458 (D.N.J. 2000), *aff'd,* 269 F.3d 270 (3d Cir. 2001). This factor weighs in favor of Rann Pharmacy.

### c.   Care and Attention Expected of Consumers (*Lapp* Factor 3)

"When consumers exercise heightened care in evaluating the relevant [services] before making purchasing decisions," there is "not a strong likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 284. Heightened care occurs frequently among professional or sophisticated consumers, who "are usually knowledgeable enough to be less likely to be confused by trademarks that are similar." 4 *McCarthy on Trademarks* § 23:101; *accord Checkpoint Sys.*, 269 F.3d at 284. But when the relevant community includes both sophisticated consumers and average consumers, "courts normally do not hold the general class to a high standard of care." *Checkpoint Sys.*, 269 F.3d at 285.

Although the patients of Rann and Rams Pharmacies are the "ultimate consumers," the care and attention of the prescribing physicians and suppliers are also relevant. *See Kos Pharm.*, 369 F.3d at 715 & n.12; *cf. Country Floors*, 930 F.2d at 1064. But neither party has submitted evidence that directly speaks to the care and attention of either. Rann Pharmacy argued only that "sophisticated members of the community," i.e., medical professionals, are actually confused. (Pl.'s Post-Hr'g Br. 3–6.) Rams Pharmacy, for its part, asserted that "retail pharmacy consumers [i.e., patients] are sophisticated enough to distinguish between the marks," because "[t]here are multiple steps involved in securing goods and services which include consumers' personal presence at the Pharmacy." (Defs.' Post-Hr'g Br. 4, 15.) Rams Pharmacy also presented the

testimony of a patient who purposefully asked for his prescriptions to be sent to Rams. (First Hr'g Ex. P-1; First Hr'g Tr. 40.) But the patient also claimed to have never heard of Rann Pharmacy, so this testimony is not evidence of a consumer distinguishing between the two pharmacies. (First Hr'g Ex. P-1; First Hr'g Tr. 40.)

Thus, the Court must evaluate this factor based on reasonable expectations. As Rams Pharmacy pointed out, patient consumers can be expected to exercise heightened care in selecting the physical location where they want to pick up prescriptions. The Court can reasonably expect a patient to know where she wants her prescription filled, and not accidently drive to the wrong location just because the names are similar. In addition, and as the Third Circuit has recognized, trained medical professionals "may be expected to be knowledgeable about, and to exercise care in distinguishing between, medicines." *Kos Pharm.*, 369 F.3d at 715–16. The Court can reasonably expect that medical professionals would exercise equal care in selecting the correct dispensing pharmacy, which ensures that patients receive their medications in a timely fashion. Indeed, both pharmacies note the importance of preventing patients from experiencing a lapse in care. (First Hr'g Tr. 16–17; Defs.' Post-Hr'g Br. 5.)

At the same time, the Third Circuit has recognized that the "[p]revention of confusion and mistakes in medicines is too vital to be trifled with." *Kos Pharm.*, 369 F.3d at 716 (internal quotation marks omitted). Confusion in the health care field can have "serious consequences for the patient." *Id.* As a result, the need to avoid confusion can outweigh the "expertise of the physicians and pharmacists." *Id.* (internal quotation marks omitted); *see* 4 *McCarthy on Trademarks* § 23:32.

The Court finds that although both the patient consumers and the physician consumers will exercise heightened care in distinguishing between Rann Pharmacy and Rams Pharmacy,

this care is at least balanced by the heightened need for patients to have timely access to medications. As a result, this factor is neutral.

### d.  Length of Time Rams Pharmacy Used its Mark Without Confusion & Evidence of Actual Confusion (*Lapp* Factors 4 & 6)

"Evidence of actual confusion is not required to prove likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 291. But because evidence of actual confusion can be difficult to find, any such evidence "may be highly probative of the likelihood of confusion." *Id.* On the other hand, if the defendant's mark has been used for "an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future." *Id.* (internal quotation marks omitted). And even when a party presents evidence of actual confusion, "[o]wnership of a trademark does not guarantee total absence of confusion in the marketplace," and courts should not unduly credit "idiosyncratic" or "isolated" instances of confusion. *A & H Sportswear*, 237 F.3d at 227 (internal quotation marks omitted).

Rams Pharmacy opened in March 2016, and the first evidence of actual confusion occurred only two months later. Since May 2016, Rann has received at least nine misdirected prescriptions from at least three different health care providers. These are not idiosyncratic or isolated mistakes. Prior to the opening of Rams Pharmacy, Rann Pharmacy—which has operated continuously for over 26 years—received erroneous prescriptions only "[o]nce in a great while." Rann's pharmaceutical supplier also thought, incorrectly, that Rams Pharmacy was a new branch or location of Rann Pharmacy. Although confusion has not occurred among "ultimate" patient consumers, this does not negate the relevance of confusion among medical professionals and suppliers. *See Kos Pharm.*, 369 F.3d at 715 & n.12; *Country Floors*, 930 F.2d at 1064.

Because consumers experienced actual confusion just months after Rams Pharmacy opened, these factors weighs heavily in favor of Rann Pharmacy.

### e. Intent of Rams Pharmacy in Adopting its Mark (*Lapp* Factor 5)

Evidence of the intentional "adoption of a mark closely similar to the existing marks weighs strongly in favor of finding the likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 286. Kommineni adopted the name RAMS PHARMACY because he is known as Ram and sought to have his customers follow him from his prior position at Skippack Pharmacy. Although Kommineni was aware of Rann Pharmacy, he testified that it never occurred to him that anyone would confuse the two, especially because doctors' offices use other information (such as address and unique pharmacy identification number) when sending prescriptions to pharmacies. (First Hr'g Tr. 9.) Because Rams Pharmacy did not intend to confuse consumers, this factor weighs in favor of Rams Pharmacy.

### f. Services Marketed in Same Channels of Trade and Advertised in Same Media; Targets of Parties' Sales Efforts; & Relationship of Services in Minds of Consumers (*Lapp* Factors 7, 8, & 9)

"[T]he greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint Sys.*, 269 F.3d 270 at 288–89 (internal quotation marks omitted). Likewise, "when parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion." *Id.* at 289. And when the services themselves are similar, consumers are likely to assume that both are offered by the same source. *Id.* at 286.

As with *Lapp* Factor 3, both patient consumers and medical professional consumers are relevant here. Neither party has presented evidence about their marketing or advertising efforts. But because both Rann Pharmacy and Rams Pharmacy are local, independent pharmacies located six miles apart in adjacent Pennsylvania towns, the Court can reasonably infer that both pharmacies target their sales to roughly the same set of patient consumers, and work with roughly the same set of medical professional consumers. This conclusion is bolstered by

evidence that at least three health care providers sent prescriptions to Rann Pharmacy instead of Rams Pharmacy. In addition, the retail pharmacy services offered by both parties are "closely-related, in competition and nearly identical," bolstering the possibility that consumers would view the pharmacies as connected. *All. Bank v. New Century Bank*, 742 F. Supp. 2d 532, 564 (E.D. Pa. 2010). As a result, this factor weighs in favor of Rann Pharmacy.

###### g. Other Factors Suggesting the Consuming Public Might Expect Rann Pharmacy to Provide Services in or Expand into the Market of Rams Pharmacy (*Lapp* Factor 10)

Converging markets can cause a high likelihood of confusion. "In assessing this factor, courts may look at the nature of the products or the relevant market, the practices of other companies in the relevant fields, or any other circumstances that bear on whether consumers might reasonably expect both products to have the same source. This issue is highly context-dependent." *Kos Pharm.*, 369 F.3d at 724.

As between Rann and Rams, this factor "encompasses the discussion of prior *Lapp* factors, *supra*." *All. Bank*, 742 F. Supp. 2d at 565. The Court can reasonably infer that two local independent pharmacies located only six miles apart have overlapping markets, as evidenced by the examples of actual confusion experienced by Rann Pharmacy. This factor weighs in favor of Rann Pharmacy.

Weighing the *Lapp* factors, and putting particular weight on mark similarity and evidence of actual confusion, the Court finds that the majority of factors support the conclusion that the mark RAMS PHARMACY is likely to cause confusion with the mark RANN PHARMACY. Because Rann Pharmacy adopted its fanciful mark first and has used it continuously for at least 26 years, the Court finds that the service mark RAMS PHARMACY infringes on the service mark RANN PHARMACY in violation of Section 43(a) of the Lanham Act.

### B. Defamation

##### i.   Defamation Under Pennsylvania Law

To recover for defamation under Pennsylvania Law, a plaintiff must prove seven elements that define the communication's defamatory nature and receipt by a third party. These elements are:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication.
> (7) Abuse of a conditionally privileged occasion.

42 Pa. Stat. and Cons. Stat. § 8343(a) (West 2016).

A plaintiff cannot recover if the court determines that the statement is not capable of a defamatory meaning. *See Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999), *aff'd*, 229 F.3d 1139 (3d Cir. 2000) (citing *Corabi v. Curtis Publ. Co.*, 273 A.2d 899 (Pa. 1971)). "A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Pennoyer v. Marriott Hotel Servs., Inc.*, 324 F. Supp. 2d 614, 618 (E.D. Pa. 2004) (internal quotation marks omitted). The court "must view the statements in context and determine whether the communication seems to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession." *Vizant Techs., LLC v. Whitchurch*, Civ. A. No. 15-431, 2016 WL 97923, at *17 (E.D. Pa. Jan. 8, 2016) (internal quotation marks omitted). The court "should assess 'the effect the statement is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons

among whom it is intended to circulate.'" *Synygy*, 51 F. Supp. 2d at 580 (alterations omitted) (quoting *Corabi*, 273 A.2d at 907).

### ii.   Rams Pharmacy Did Not Defame Rann Pharmacy

Rann Pharmacy alleges that Rams Pharmacy made a defamatory communication when it told third parties that Rann committed a HIPAA violation. But there is no evidence that Rams Pharmacy ever published or communicated a statement accusing Rann Pharmacy of violating HIPAA. Even if such a communication can be inferred, the statement does not have a defamatory meaning.

The three letters that Rams Pharmacy sent to patients do not accuse Rann of violating HIPAA. Instead, the letters stated that Rams "has discovered a potential breach of your personal health information," and explained the pharmacy's belief that the information was "inadvertently disclosed to a third party by a third party on or around 07/29/2016."[5] The letters do not identify Rann Pharmacy, much less accuse Rann of violating HIPAA.

There is also no evidence that Kommineni told anyone in person that Rann Pharmacy committed a HIPAA violation. In his direct examination of Patel, Kommineni states that he called Patel to the pharmacy to "discuss some things," mentioned the "HIPAA law, what exactly HIPAA law and what are the privacy practices," and told Patel "what other steps [he] should take." (First Hr'g Tr. 42–43.) Kommineni also testified that he "explained the HIPAA rules and [Patel's] rights and responsibilities," and told Patel "what is actually compromised, what I feel like the information is in breach." (First Hr'g Tr. 27–28.) None of this constitutes an allegation that Rann Pharmacy violated HIPAA. Although the letter written by Patel does claim that "Rann

---

[5] One letter leaves off the word "inadvertently."

Pharmacy intentionally violated my HIPAA rights," Kommineni did not draft the faxed letters—Patel and the other patient did.

But even if the Court were to infer that Kommineni told Patel and the second letter-writer that Rann Pharmacy had violated HIPAA, the communication would not constitute defamation because it lacks a defamatory meaning. Kommineni was attempting in good faith to follow his HIPAA obligations. HIPAA prohibits pharmacies from disclosing protected individually identifiable health information[6] unless allowed by the HIPAA rules or authorized by the patient. 45 C.F.R. § 164.502(a)(1); U.S. Dep't Health & Human Servs., *Covered Entities and Business Associates.*[7] The disclosures allowed by the HIPAA rules do not include substantiating a Lanham Act claim, as Rann Pharmacy did when it sent prescriptions with unredacted patient information to Rams Pharmacy. *See* § 164.502(a)(1). HIPAA also mandates that if a pharmacy discovers a breach of unsecured protected health information, the pharmacy must "notify each individual whose unsecured protected health information has been, or is reasonably believed by the covered entity to have been, accessed, acquired, used, or disclosed as a result of such breach." *Id.* § 164.404(a)(1).

---

[6] "Individually identifiable health information is information that is a subset of health information, including demographic information collected from an individual, and:

(1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and

(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and

(i) That identifies the individual; or

(ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual."

45 C.F.R. § 160.103. Protected health information is individually identifiable health information that is transmitted or maintained in any form or medium, with some exceptions not relevant here. *Id.*

[7] http://www.hhs.gov/hipaa/for-professionals/covered-entities/index.html (last visited Nov. 7, 2016).

Whether Rann Pharmacy violated HIPAA is not at issue in this case. But under the circumstances, a communication to two potential breach victims that Rann Pharmacy violated HIPAA does not have a defamatory meaning. Such a communication was not calculated to lower Rann Pharmacy in the estimation of the community, nor to deter Patel and the other letter-writer from visiting Rann Pharmacy. *See Pennoyer*, 324 F. Supp. 2d at 618; *Synygy*, 51 F. Supp. 2d at 580 (citing *Corabi*, 273 A.2d at 907). Instead, Rams Pharmacy was trying to inform patients of a potential breach of protected health information, as required by HIPAA. That Rams Pharmacy characterized the breaches as "inadvertent[] disclos[ures]" supports this conclusion.

Because there is no evidence that Rams Pharmacy made a defamatory communication with defamatory meaning, Rann Pharmacy's claim of defamation fails as a matter of law.

### C. Tortious Interference with Prospective Contractual Relationships

To prove tortious interference with contractual relations, Pennsylvania law requires the plaintiff to prove four elements:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; [and] (4) legal damage to the plaintiff as a result of the defendant's conduct

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009). The second element, purposeful action by a defendant, includes intentionally confusing customers. *Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F. Supp. 2d 471, 487–88 (E.D. Pa. 2010).

When claiming interference with *prospective* contractual relations, the plaintiff must provide evidence of a fifth factor: "objectively reasonable likelihood or probability that the contemplated contract would have materialized absent the defendant's interference." *Acumed*,

561 F.3d at 212 (internal quotation marks omitted). This fifth element is "something less than a contractual right but something more than a mere hope that there will be a future contract." *Id*.

Rann Pharmacy claims that Rams Pharmacy purposefully interfered with Rann's ability to "secure business from future pharmaceutical customers in the community" by (1) alleging that Rann Pharmacy had violated HIPAA and (2) using the infringing mark RAMS PHARMACY. (Pl.'s Post-Hr'g Br. 16–17.) Both arguments fail. First, Rann has shown nothing more than "a mere hope" that Patel and the other letter-writer would have used the services of Rann Pharmacy. *See Acumed*, 561 F.3d at 212. To the contrary, the evidence shows that Patel intended to continue using the services of Rams Pharmacy well before he was notified of a potential breach of his personal health information. (First Hr'g Ex. P-1; First Hr'g Tr. 40.) Second, Kommineni selected the name RAMS PHARMACY after his own nickname, and there is no evidence that he intended to intentionally confuse patient consumers. *Cf. Pierre & Carlo*, 713 F. Supp. 2d at 487–88.

Rann Pharmacy's claim of tortious interference with prospective contractual relationships fails as a matter of law.


III.     **CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Rann Pharmacy's motion for an injunction against Rams Pharmacy. Because Kommineni is changing the name of his pharmacy to RAMSRX PHARMACY, a process that will take four to six weeks, the Court will provide Defendants with 60 days to comply with the Court's ruling. An Order consistent with this Memorandum will be docketed separately.